99 N.J. Super. 365 (1968)
240 A.2d 31
JEROME M. LARSON, PLAINTIFF,
v.
THE MAYOR AND COUNCIL OF THE BOROUGH OF SPRING LAKE HEIGHTS, NEW JERSEY, DEFENDANT.
HERBERT HARKER, MARY HARKER, HELEN E. HARKER AND MERCER COURT, INC., A NEW JERSEY CORPORATION, PLAINTIFFS,
v.
THE MAYOR AND COUNCIL OF THE BOROUGH OF SPRING LAKE HEIGHTS, NEW JERSEY, DEFENDANT.
KIRSCH HOLDING COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
THE BOROUGH OF MANASQUAN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided February 19, 1968.
*366 Mr. Robert V. Carton for the plaintiff Jerome M. Larson, (Messrs. Carton, Nary, Witt & Arvanitis, attorneys).
Mr. Henry W. Sayrs for plaintiffs Hebert Harker, Mary Harker, Helen E. Harker and Mercer Court, Inc.
Mr. Theodore D. Parsons, Jr. for plaintiff Kirsch Holding Company (Messrs. Parsons, Canzona, Blair & Warren, attorneys).
*367 Mr. William C. Nowels for defendant Mayor and Council of Spring Lake Heights.
Mr. John D. Wooley for defendant, Manasquan.
SIMMILL, J.S.C.
Three actions in lieu of prerogative writs were consolidated for trial. The basic issue involved in all is the validity of ordinances expressly enacted pursuant to N.J.S.A. 40:48-1(6) and 40:48-2, which ordinances, in essence, prohibit in defendant-municipalities the use, occupancy or rental of dwellings by and to "non-family" groups as defined in the ordinances. More simply put, the ordinances prohibit "group rentals."
The two ordinances in question, one of the Borough of Spring Lake Heights and the other of the Borough of Manasquan, are essentially the same, the only substantive difference being that the Spring Lake Heights ordinance applies throughout the municipality while the Manasquan regulation is limited to residential zones. What the ordinances do is to prohibit unrelated persons from occupying the same dwelling unit within the municipality (or, in the case of Manasquan, within a residential zone). While much has been made by plaintiffs of arguable problems of definition in the language of the ordinances, the language, purpose and effect of them is not unclear. The issue this court must decide is whether such ordinances, enacted pursuant to the general police power granted to municipalities and which prohibit unrelated persons from living together in the borough (or, in the case of Manasquan, in the residential zones of the borough) are valid. It ought to be stressed that the subject ordinances are not zoning regulations enacted pursuant to N.J.S.A. 40:55-30 et seq.
As mentioned, the two ordinances under attack are essentially identical and reference will be made to them individually only where such differentiation is relevant. Otherwise, the court feels that on the merits the question of validity is unaffected by whatever differences may exist. Finally, it has *368 been stipulated by counsel that procedurally, the ordinances were validly adopted as general police power ordinances, while their passage as zoning regulations was not regular.
The ordinances in question were adopted by the municipalities to meet a particular problem that has developed in recent years. To a large extent the problem derives from the geographic location of defendant municipalities, and in fact is inherent to some degree in the resort characteristic of the area. Although related to seasonal population increases generally, the evidence clearly shows that a particular segment of this population influx is primarily responsible for the problems sought to be dealt with. To understand the nature of the problems, a brief sketch of the social and economic development of the area is appropriate.
Defendant municipalities are located on or near the Atlantic coast, in an area whose economy is predicated largely on seasonal revenues. During the summer months there is a great population increase; in fact, the police chief of Manasquan testified that in his municipality the increase in the summer is as much as six times the yearly population. The situation in Spring Lake Heights is somewhat different, since that borough is not itself a beach-front community, but rather borders on several such municipalities. Notwithstanding this, however, Spring Lake Heights is an integral part of the seashore area, and does experience a population increase in the summer months.
In years past, prior to the universal advent of the automobile and the construction of the Garden State Parkway and other modern roads, the seasonal population was made up largely of families who rented cottages or rooms for the summer. A great number of cottages and other type dwellings were built to accommodate these seasonal rentals. Times changed, however, and the seasonal rentals became monthly and then weekly; the automobile and improved roads made it convenient for families to come down at their pleasure, and full seasonal rentals diminished. At the same time, the owners and landlords discovered that by renting these cottages to *369 groups of young men or young women, they would receive a higher rental, since the cost to the lessees was distributed among them; four individuals could afford collectively more than one family. Furthermore, these groups were willing to rent for the entire season, eliminating the need for finding successive tenants for the same dwelling unit for one season. All in all, rental to groups proved to be far more lucrative and easier to obtain than rental to families, and in recent years the number of group rentals has increased significantly.
But despite the economic advantage to the property owners, group rentals created and contributed to problems which adversely affected the municipalities involved. Noise, acts of immorality, public drunkenness, lewd conduct, traffic and parking congestion were some of the problems related in whole or in part to group rentals. The testimony and exhibits presented clearly support defendants' position that group rentals contribute more than their share to the problems mentioned above. In Manasquan, for example, for the summer months during 1965, 1966 and 1967, the police reports show 121 noise and related complaints. Of these, at least 65, or 54%, involved premises rented to groups. That is, more than half of the complaints were related to group rentals constituting a minor proportion of the population as a whole. Furthermore the testimony showed that actual complaints to the police, reflected in the police records, were made in considerably less than all cases where such complaints were appropriate; and again, for the majority of the time the source of the incidents was group rentals.
The most prevalent complaint concerning the groups was noise. This, above all, was the major source of irritation. The other complaints dealt with parking and traffic congestion, obscene language and lewd conduct, including fornicating in cars on the public streets. Incidents of immoral conduct and illicit relations inside the dwellings were also related by the witnesses.
To remedy or eliminate these problems, which the public officials felt were due largely to the absence of parental or *370 other supervision and control within the premises, the subject ordinances were enacted.
The Spring Lake Heights ordinance, which, as mentioned, is substantively identical to the Manasquan ordinance, provides in its most relevant parts as follows:

"Preamble
Whereas, the use and occupancy of dwelling units by other than a `family' as defined herein, has caused and resulted in acts of rowdyism, excessive noise, intoxication, vice, immorality, breach of public peace and order, and similar acts disturbing the peace and quiet of the neighborhood, and in order to prevent such disturbances and disorderly assemblages adversely affecting the peace and quiet of citizens of the Borough of Spring Lake Heights; and
Whereas, such use and occupancy has caused an overcrowding of dwelling units, increased traffic congestion in the streets; and
Whereas, such use and occupancy has greatly increased the need for police protection and surveillance; and
Whereas, such use and occupancy tends to depreciate property values to the detriment of citizens of the Borough of Spring Lake Heights; and
Whereas, such use and occupancy adversely affects the general welfare of the community;
Be it ordained by the Mayor and Council of the Borough of Spring Lake Heights, in the County of Monmouth and State of New Jersey, as follows:
§ 43-1. Authority.
Under and by virtue of the authority granted under N.J.S.A. 40:48-1 (6) and 40:48-2, the rental, use and occupancy of any dwelling unit, as herein defined by any person or persons other than a family as herein defined, are hereby prohibited.
§ 43-2. Definitions.
A FAMILY is defined as follows:
A collective group of persons related by kinship, adoption, blood or marriage, living together under the same roof, in a common household whose relationship is of a permanent and distinct domestic character and not resort or seasonal in character or nature, including any domestic servants, lodgers, boarders or guests.
DWELLING UNIT  Shall mean any room or group of rooms or any part thereof located within a building and forming a single habitable unit with facilities which are used, or designed to be used, for living, sleeping, cooking or eating.
§ 43-3. Occupancy restricted to a `family'; exceptions.
No house, dwelling, building, structure or enclosure, shall be used, or be permitted to be used, or be rented for use, as living quarters or sleeping quarters or for living purposes or sleeping purposes, by or to any society, club, fraternity, sorority, association, lodge, combine, *371 federation, group, coterie or organization, or to any person or member on behalf of the same, or to any group or collection of persons who are unmarried or who do not qualify as a family as defined in this ordinance. This section shall not apply to rooming houses, hotels, motels or other places of public accommodation in the Borough of Spring Lake Heights, which places are duly licensed as such by the said borough, or convents, rectories or parish houses or manses utilized in conjunction with any church or synagogue or similar house of worship.
§ 43-8. Exceptions.
This ordinance shall not apply to a person living alone whose residence in the Borough of Spring Lake Heights is permanent and not resort or seasonal in character or nature, including domestic servants or guests."
Numerous arguments for and against the validity of the ordinance have been advanced. For the reasons set forth below this court is of the opinion that although the municipalities had the authority to pass the subject legislation as a valid exercise of their police powers, the ordinances in their operation and effect are arbitrary and unreasonable and thus invalid.
A substantial attack on the validity of the ordinances is made on the ground that they are invalid as general police power regulations. Plaintiffs' argument is that the ordinances regulate the use of land, and are proper only as an exercise of the zoning power. That is, the Legislature has provided in N.J.S.A. 40:55-30 et seq., the means by which a municipality can deal with problems relating to use of land. Having specifically so provided, the municipality is obliged to follow the procedures provided in the Zoning Act, and may not pass a land-use restriction ordinance under the general statutory grant of police power.
Although, in a proper factual setting, it may well be that powers conferred specifically by one statute may not be exercised by a municipality under some other general legislative grant, see Magnolia Development Co., Inc. v. Coles, 10 N.J. 223 (1952), a regulation enacted within the scope of the general police power will not be invalidated merely because it could have been enacted under some other *372 legislative authority, such as the power to zone. Kligman v. Lautman, 98 N.J. Super. 344 (App. Div. 1967) see Fred v. Mayor, etc., of Old Tappan, 10 N.J. 515 (1952); Howell Twp. v. Sagorodny, 46 N.J. Super. 182 (App. Div. 1957), affirmed per curiam for reasons expressed below, 25 N.J. 502 (1958). The question in each case is whether a specific legislative scheme is subverted by enactment of an ordinance under some other authority. "In the instant case, however, we discern no other legislative scheme subverted by a regulatory ordinance of the type here involved." Fred v. Mayor, etc. of Old Tappan, supra, at p 521. See also Cranberry Lake Quarry Co. v. Johnson, 95 N.J. Super. 495 (App. Div. 1967), and N.J.S.A. 40:55-49 which recognizes that ordinances affecting zoning might be enacted under nonzoning authority. As the law now stands, a municipality may enact ordinances under their grants of the general police power even though they might also enact the ordinances under the zoning power. Furthermore, in the present case, one of the express purposes of the ordinances is to prevent "acts of rowdyism, excessive noise, intoxication, breach of public peace and order, and similar acts disturbing the peace and quiet of the neighborhood," and it is clear that N.J.S.A. 40:48-1(6) and 40:48-2 are designed particularly to deal with the problems mentioned. See Howell Twp. v. Sagorodny, supra, in which it was held that municipal regulation of junk yards under N.J.S.A. 40:52-1 was not precluded by the fact that regulation of the same was proper as an exercise of the zoning power.
It appearing that the municipalities have the authority to enact under their general police power the ordinances in question, it must next be considered whether these ordinances are a proper exercise of that authority.
While it is axiomatic that ordinances enacted by municipalities within their delegated powers are presumed to be valid, such validity can be rebutted by a showing that the ordinance is arbitrary and unreasonable. Kozesnik v. Montgomery Twp., 24 N.J. 154 (1957); Schmidt v. Board *373 of Adjustment, Newark, 9 N.J. 405 (1952). "In determining the question of reasonableness cognizance must be taken of the problem to be solved by the municipality, for example the requirement necessary to minimize the offensive character of the conduct to be regulated." State v. Mundet Cork Corp., 8 N.J. 359, 369 (1952), certiorari denied, 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637 (1952); Katobimar Realty Co. v. Webster, 20 N.J. 114 (1955); Grogan v. De Sapio, 11 N.J. 308 (1953). "[I]n the final analysis, it is the nature of the subject matter and the end to be served that determine the quality and content of the regulatory power." Abelson's, Inc. v. N.J. State Board of Optometrists, 5 N.J. 412, 420 (1950); In re Weston, 36 N.J. 258 (1961). This is especially true where rights of private property are involved, as here in relation to lawful uses thereof and the carrying on of a lawful business. See Katobimar Realty Co. v. Webster, supra; Reingold v. Harper, 6 N.J. 182 (1951); Lakewood Express Service v. Board of Public Utility Com'rs., 1 N.J. 45 (1948); N.J. Good Humor, Inc. v. Bradley Beach, 124 N.J.L. 162 (E. & A. 1939); Regal Oil Co. v. State, 123 N.J.L. 456 (Sup. Ct. 1939). A police regulation in this regard "shall not go beyond the demands of the public interest which vindicates its exercise * * *: an exercise of power that exceeds the bounds of reasonable necessity would run afoul of the fundamental common right to engage in a lawful pursuit and of the right of private property secured by the Fifth and Fourteenth Amendments of the Federal Constitution and [Art. I, par.1] of the State Constitution." Reingold v. Harper, supra, at p. 191. As is succinctly stated in the leading case of N.J. Good Humor, Inc. v. Bradley Beach, supra: "There cannot be in the name of police regulation, an unreasonable and oppressive curtailment of personal or property rights. A measure that goes fairly beyond the public need designed to be served does not take the category of a valid police regulation." (At p. 168).
This court is of the opinion that the subject ordinances are unreasonable. They go "beyond the public need" *374 and are an "excessive restriction" on the use of private property and the pursuit of lawful activity, Katobimar Realty Co. v. Webster, supra; they are palpably excessive as a "requirement necessary to minimize the offensive character of the conduct to be regulated," State v. Mundet Cork Corp., supra. In short, "[t]he sweeping rule of the ordinance is manifestly not sustainable as including only a reasonable margin to insure effective enforcement of the asserted object." N.J. Good Humor, Inc. v. Bradley Beach, supra, at p. 167.
In the present case the problems of noise, immorality, parking violations, etc., are clearly proper for municipal treatment. But the municipalities should not "burn the house to roast the pig." Rather than make any attempt to enforce existing statutes and ordinances relating to the actions complained of,[1] the municipalities passed additional comprehensive ordinances outlawing otherwise legal conduct which was thought to be a prime source of the obnoxious and illegal conduct. But "[t]he duty of the township officials is to suppress the disorder and to punish those who are guilty of the illegal act, not to prevent the performance of the legal act." N.Y. Staats-Zeitung v. Nolan, 89 N.J. Eq. 387, 389 (Ch. 1918).
The evidence presented in the instant case unequivocally demonstrates that little, if any, attempt has been made to suppress the problems complained of by prosecution of the perpetrators. In fact, even though "numerous" acts of illegal sexual intercourse were engaged in in the presence of public officials, police officers and private citizens, never was any arrest or formal complaint made under the criminal law. *375 Similar nonaction followed the witnessing of indecent exposures and other lewd and immoral conduct; and, in fact, nonaction was the pattern in relation to all the conduct complained of. Before this court will uphold as reasonable a police prohibition as pervasive as the present one, its necessity in relation to the evil involved will have to be shown, see In re Weston, Katobimar Realty Co. v. Webster, Grogan v. De Sapio, State v. Mundet Cork Corp., and N.J. Good Humor, Inc. v. Bradley Beach all supra, at least to the extent of resurrecting the presumption of validity.
Furthermore, it is clear that the ordinances are arbitrary in that under the definition of "family" absurd distinctions exist and certain relationships are prohibited which bear no relation to the evils existing or to anything which a municipality has the right to control. Under the ordinance it would be unlawful for two friends to share a house or apartment, even if their relationship were of a "permanent and distinct domestic character." It would not be unlawful, however, if the two were cousins. But two cousins whose common household was seasonal in nature would violate the ordinance by living together, as would a mother and daughter, or aunt and niece who did not share a common household on a permanent basis. Moreover, one person living alone for the summer season would be subject to the penalties imposed by the ordinance, but there would be no penalty if his residence in the borough were permanent in character. A person living alone as a permanent resident would violate the ordinance by taking in lodgers or boarders, but a family who lived in the borough only for the summer months would not. And by what stretch of the general police power can a municipality declare it illegal as necessary for the prevention of vice, drunkenness and immorality, or the preservation of the public health, safety and welfare, to ban during the summer months two spinster sisters who want to vacation together?
The present case is not dissimilar in essence from Borough of Point Pleasant Beach v. Point Pleasant Pavilion, 3 N.J. *376 Super. 222 (App. Div. 1949). There an ordinance was enacted which provided that all businesses (with four specific exceptions) must be conducted under cover of permanent buildings. In finding the ordinance unreasonable on its face, the court said:
"We are not prepared to say that the borough * * * would be wholly helpless in meeting the problem which might result from unrestricted operation of open amusements along its boardwalk. * * * However, the real difficulty in the present case is that no attempt has been made by the borough to adopt a regulation reasonably calculated to meet the problem as thus stated. Instead, [the subject ordinance was adopted] which, in comprehensive fashion, seeks to wipe out all business anywhere in the borough * * * which might require operation, in whole or in part, in the open. Thus the ordinance, under its terms, is broad enough to exclude the customary gasoline station * * * and the familiar `Good Humor man'. * * * Similarly, it would exclude terrace service at hotels and restaurants and, indeed, numerous legitimate and acceptable business operations outside the confines of the `cover of permanent buildings.' We believe the restriction, to the extent imposed, is unnecessary and has no reasonable relation to such public purposes as may properly be sought to be served." (at pp. 225-226).
So, too, in the present case there has been no attempt by the municipality to enforce regulations "reasonably calculated to meet the problem"; and the ordinances, as they stand, go beyond the public need designed to be served, and unnecessarily regulate and prohibit otherwise lawful conduct. See also Signore v. Rizzolo, 9 N.J. Super. 539 (Law Div. 1950).
It should be mentioned that the decision of this case involves no opinion as to the validity of a properly enacted zoning ordinance which might deal with the subject in similar fashion to the ordinances in question. Several cases have upheld ordinances which have zoned municipalities for single-family use, e.g., Collins v. Board of Adjustment, Margate City, 3 N.J. 200 (1949); Guaclides v. Englewood Cliffs, 11 N.J. Super. 405 (App. Div. 1951), and under a proper exercise of the zoning powers a use may be excluded which could not be so excluded under the general police *377 power. Andover Tp. v. Lake, 89 N.J. Super. 313 (App. Div. 1965).
For the reasons stated, that is, that as worded the ordinances are arbitrary and as applied unreasonable, judgment will be entered in favor of all plaintiffs.
NOTES
[1] In Spring Lake Heights, for example, the following ordinances are applicable: Vehicle and Traffic; Noise; Garbage and Rubbish; Peace and Good Order.

In Manasquan, applicable ordinances admitted into evidence included Zoning; Disorderly Persons, and two Noise Ordinances.
In addition the Motor Vehicle and Traffic Act, Disorderly Persons Act and the criminal laws would be violated by the conduct complained of.